O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMERICAN BULLION, INC., | Case No. CV 14-01873 DDP (ASx) |
| Plaintiff, | **ORDER GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |
| v. | |
| REGAL ASSETS, LLC; TYLER GALLAGHER, AN INDIVIDUAL; KELLY FELIZ, AN INDIVIDUAL, | [Dkt. 47] |
| Defendants. | |

Presently before the court is Plaintiff American Bullion Inc. ("American Bullion")'s Motion for Preliminary Injunction. Having considered the submissions of the parties and heard oral argument, the court grants the motion and adopts the following order.

**I.  Background**

American Bullion and Defendant Regal Assets, LLC ("Regal") are business competitors in the field of adding gold and other precious metals to individual retirement accounts.[1] (Complaint ¶¶ 1,17.) They also convert existing retirement accounts into precious

---

[1] Defendant Gallagher is alleged to be Regal's Chief Executive Officer, owner, and/or alter ego. (Compl. ¶¶ 10, 12.)

metals. (Id.) American Bullion generates business by relying on word of mouth, but also by promoting itself online. (Id. ¶ 17.)

Regal advertises its services online via third-party affiliates, who are paid for referred business. (Compl. ¶¶ 20, 23.) Plaintiff alleges that Defendants Regal and Gallagher (collectively, "Defendants") have created and are operating several such affiliate websites. (Compl. ¶ 26.) Although the websites operated by Defendants purport to contain independent consumer reviews, Plaintiff contends that, in reality, Defendants provide content to the affiliates and use affiliate websites to falsely advertise Regal and to disparage Plaintiff. (Comp. ¶ 23.) Plaintiff alleges that the websites are in no way independent, and that Defendants do not publicly disclose their connection to the websites. (Compl. ¶ 25.)

Reviews on the websites praise Defendants, give negative reviews about Plaintiff's services, and disseminate false statements about Plaintiff. (Compl. ¶ 45.) Some of the affiliate websites, for example, claim that Plaintiff was a defendant in a lawsuit accusing it of fraud, and that Plaintiff was found guilty and later sued by the U.S. Commodities Futures Trading Commission. (Compl. ¶ 37; Ex. 4.) Plaintiff contends that this is false, and that a business with a similar name, American Bullion Exchange, was in fact the party found guilty in that action. (Compl. ¶ 38.)

Many of the websites also allegedly use Plaintiff's name to misdirect potential customers. (Compl. ¶ 40.) Plaintiff asserts that the websites urge customers to "click here to visit American Bullion," but are then linked to Regal's website instead of to American Bullion. (Id.) Plaintiff further alleges that it

requested Defendants remove the materials and stop the dissemination of false information, to no avail. (Compl. ¶ 41.)

The Complaint alleges causes of action for false and misleading advertising under the Lanham Act, 15 U.S.C. 1125(a), and state law, as well as state law causes of action for unfair competition, unfair business practices, trade libel, defamation, and intentional interference with prospective economic advantage. Plaintiffs now move for a preliminary injunction compelling Defendants to remove the offending online content, post statements describing the inaccuracies of the removed content, suspend payments to any affiliates continuing to display the alleged mispresentations, and make certain disclosures to new customers referred to Regal through the affiliate marketing program.

**II. Legal Standard**

A private party seeking a preliminary injunction must show that: (i) it is likely to succeed on the merits; (ii) it will suffer irreparable harm in the absence of preliminary relief; (iii) the balancing of the hardships and equities between the parties that would result from the issuance or denial of the injunction tips in its favor; and (iv) an injunction will be in the public interest. Winter v. Natural Res. Defense Counsel, 555 U.S. 7, 20 (2008). Preliminary relief may be warranted where a party: (i) shows a combination of probable success on the merits and the possibility of irreparable harm; or (ii) raises serious questions on such matters and shows that the balance of hardships tips in favor of an injunction. See Arcamuzi v. Continental Air Lines, Inc., 819 F.2d 935, 937 (9th Cir. 1987). "These two formulations represent two points on a sliding scale in which the required

3

degree of irreparable harm increases as the probability of success decreases." Id. Under both formulations, the party must demonstrate a "fair chance of success on the merits" and a "significant threat of irreparable injury" absent the issuance of the requested injunctive relief.[2] Id.

**III. Discussion**

    A.   Likelihood of Success on the Merits

Defendants argue that American Bullion cannot demonstrate a likelihood of success on the merits because neither Regal nor Gallagher is responsible for the offending content on the Regal affiliate websites. (Opposition at 7-11.)

Under Regal's Affiliate Program Agreement ("the Affiliate Agreement" or "Agreement"), affiliates, who are ostensibly independent contractors, receive commissions for generating leads for Regal and for facilitating transactions on Regal's site. (Affiliate Agreement, Declaration of Aaron Wais in Support of Motion, Ex. 1 at 3, 4-5, 11.) Affiliates, in turn, are required to, among other things:

- "Promote" Regal (Agreement ¶ 7);
- "[P]lace dedicated and relevant content on [the affiliate's] sites or offers directing users to the lead capture form or dedicated links provided [by Regal] (Agreement ¶ 7(b));[3] and

---

[2] Even under the "serious interests" sliding scale test, a plaintiff must satisfy the four Winter factors and demonstrate "that there is a likelihood of irreparable injury and that the injunction is in the public interest." Alliance for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1135 (9th Cir. 2011).

[3] Regal provides affiliates with approved content, including forms, links, banners, "swipe files," marketing materials, "and
(continued...)

4

- "[C]onsent[] to [Regal] monitoring the Affiliate's sites or offers to determine continued compliance . . . ." (Agreement ¶ 7(e).)

The Affiliate Agreement also places numerous restrictions upon affiliates. Some of these provisions state that:

- Affiliates may not perform similar services for any of Regal's competitors (Agreement ¶ 20(c));
- Upon termination of the Agreement by either party, affiliates "may NOT conduct any business or services directly or indirectly related to the sales of precious metals" for a period of five years (Agreement ¶ 20(c));
- Affiliates may not display "content that is not acceptable to [Regal] or inconsistent with the image that [Regal] wishes to create . . . ." (Agreement ¶ 4);
- Regal retains "absolute discretion" to terminate affiliates from the program at will, "for any reason whatsoever." (Id.); and
- Affiliates must immediately forfeit all commissions generated upon suspension or termination from the program. (Agreement ¶ 1.)

In support of Regal's contention that it is not responsible for content on affiliate sites, Defendant Gallagher states that Regal affiliates are independent contractors, and that neither he nor Regal owns or controls affiliates. (Declaration of Tyler Gallagher ¶ 11.) Gallagher further declares that Regal does not provide any review content to affiliates, most of whom disclose

---

[3](...continued)
other advertising material." (Agreement ¶ 7(c).)

that they are independently owned and receive compensation from the companies they review and recommend. (Id. ¶¶ 14-15.) According to Gallagher, Regal polices its affiliates closely, and forbids them to use aliases or fake photographs. (Id. ¶¶ 20, 39, 44-45, 49.) Gallagher also states that, despite the clear language limiting affiliates' dealings in the precious metals industry, affiliates are free to send leads to Regal's competitors. (Gallagher Decl. ¶ 11.)

Gallagher also denies that Regal provides any of the purportedly independent content displayed on affiliate websites. (Gallagher Decl. ¶ 29.) Gallagher asserts that Regal only provides: (1) a "cookied" version of the Regal site, essentially a clone of the Regal site with the affiliate's specific telephone number and a number identifying the particular affiliate to Regal; (2) a "lead capture form," (3) banners and text ads, (4) e-mail templates known as "swipe files," (5) images and videos, and (6) charts.[4] (Id. ¶¶ 30-37.)

"A principal is liable for his agent's negligence 'in the transaction of the business of the agency,' . . . or where the principal has authorized or ratified the agent's conduct." Ogala v. Chevron Corp., No. 14-cv-173-SC, 2014 WL 2089901 *3 (N.D. Cal. May 19, 2014) (citing Cal Civ. Code §§ 2338, 2339). "An agent is one who acts on the principal's behalf and subject to the principal's control. To form an agency relationship, both the principal and the agent must manifest assent to the principal's right to control

---

[4] Several of the exhibits described in Gallagher's declaration, including Exhibits M, N, P, and Q, are either mislabeled or not attached to the declaration.

the agent." United States v. Bonds, 608 F.3d 495, 506 (9th Cir. 2010) (internal alteration, quotation marks, and citation omitted). "Actual control is not necessary[;] as long as there is an agreement that the principal has the right to control the agent, an agency relationship exists." Western Sugar Co-op v. Archer-Daniels-Midland Co., No. CV 11-3473, 2012 WL 3101659 * 5 (C.D. Cal. Jul. 31, 2012).

As an initial matter, the terms "independent contractor" and "agent" are not mutually exclusive. An independent contractor may also be an agent. Bonds, 608 F.3d at 505. In addition, "[t]he substance of the parties' relationship, not the label they give it, determines the existence of agency." United States v. Cyberheat, Inc., No. CV-05-457 TUC, 2007 WL 686678 at * 13 (D. Ariz. Mar. 2, 2007); See also Parallel Synthesis Techs., Inc. v. DeRisi, No. 5:13-cv-05968-PSG, 2014 WL 4748611 at *4 (N.D. Cal. Sept. 23, 2014). The Affiliate Agreement's pronouncement and Gallagher's corresponding statement that affiliates are independent contractors are therefore of no moment.

Furthermore, Plaintiff points to a host of evidence that appears to contradict Gallagher's sworn statements. Though Gallagher declares that Regal does not provide any review content to affiliates, an alleged "Regal Affiliate recruitment site"[5] includes a template for reviews of American Bullion, which conclude with language recommending that viewers use Regal instead. (Third Declaration of James Berkley (Dkt. 132), Ex. 124 at 3. P.168=70)

---

[5] www.trustgoldira.com.

7

1    Further, and contrary to Gallagher's assertion that Regal only
2 provides a narrow, limited set of content to affiliates, Regal's
3 official affiliate recruitment page, regalgoldaffiliates.com,
4 offered to create an entire, custom "Done for You" site for
5 affiliates, including themes, plugins, and original content.
6 (Berkley Decl. III, Ex. 85 at 2.)  The "swipe file" content
7 admittedly provided by Gallagher to affiliates has also appeared on
8 web sites as recently as September 14, 2014, and includes false
9 narratives, such as that the purported author, who in reality is a
10 made-up persona, is "happy to tell you that after countless months
11 of research, I have found the most reputable company . . . . I
12 have worked with them personally, and couldn't be more pleased . .
13 . .  I urge you to get in contact with Regal Assets." .  (Id., Ex.
14 105; Gallagher Decl., Ex. O.)  Notwithstanding Gallagher's claim
15 that Regal polices its affiliates, websites touting Regal and
16 purporting to be authored by industry experts, such as the
17 aforementioned, entirely fictitious "Reeves Jameson," remain
18 active.  (E.g., Berkley Decl. III, Ex. 88.)
19    Plaintiff has demonstrated a likelihood of success on the
20 merits.  There appears to be little dispute that Lanham Act
21 violations, at the very least, have occurred.  While Defendants
22 seek to foist responsibility for those violations upon Regal
23 affiliates, the record before the court indicates that those
24 affiliates are Defendants' agents.  Gallagher's assertions
25 regarding affiliates' independence are belied by other evidence.
26 Most significantly, the Affiliate Agreement grants Regal nearly
27 complete control over its affiliates.  Regal enjoys unbridled
28 authority over affiliates' website content, much of which is

8

provided by Regal itself. All affiliate content must conform to the "image" that Regal wishes to create and be otherwise acceptable to Regal. Failure to hew to Regal's strictures carries significant consequences for affiliates who, because they are barred from doing any other business in the precious metals field, depend entirely upon Regal for their income in the precious metals industry. Affiliates' need to stay in Regal's good graces is intensified by the post-agreement five-year ban on affiliates' business in the industry, which further solidifies Regal's control. Under such circumstances, Regal affiliates can hardly be characterized as truly independent. Rather, affiliates are essentially captive shills for Regal, obligated to generate leads and sales for Regal by regurgitating Regal-generated content and toeing the party line, at pain of excommunication from the entire field. By entering into the Affiliate Agreement, both Regal and its affiliates unequivocally manifested assent to Regal's control. Accordingly, Regal, as master to its servant affiliates, is responsible for their actions.

    B.    Remaining Factors

        1.    Irreparable Harm

Regal contends that American Bullion has failed to demonstrate a likelihood of irreparable harm because (1) customers' stated preferences for Regal over American Bullion are insufficient to establish harm and (2) the allegedly wrongful conduct has ceased. It is well established that damage to goodwill or loss of control over business reputation can constitute irreparable harm. Herb Reed Enters., LLC v. Florida Entm't Mgmt., Inc., 736 F.3d 1239, 1250 (9th Cir. 2013). As Regal itself acknowledges, American

9

1  Bullion has provided evidence of lost sales.  American Bullion
2  received feedback from at least twenty-four consumers who chose not
3  do business with American Bullion, but did provide feedback as to
4  why they avoided American Bullion's Services.  (Declaration of
5  Richard Warren in Support of Motion, ¶ 12.)  Of those consumers,
6  nearly all opted to deal with Regal instead.  (<u>Id.</u>)  Several
7  consumers highlighted reviews touting Regal, bad reviews of
8  American Bullion, and references to nonparty American Bullion
9  Exchange as motivating forces behind their decisions to use Regal
10 rather than American Bullion.  (<u>Id.</u>)

    Regal's contention that these testimonials are not numerous
12 enough to establish a likelihood of irreparable harm is not
13 persuasive.  Nor, as discussed above, does it appear to the court
14 that wrongful acts have ceased.  False narratives apparently
15 originating in Regal's "swipe files" continue to appear online, as
16 does content purportedly authored and promulgated by the entirely
17 fictitious "Reeves Jameson" persona utilized by Regal's agents.
18 American Bullion has therefore demonstrated a likelihood of
19 continuing irreparable harm.

20          2.   Balance of Equities and the Public Interest
21     This court must consider the effect on both parties of
22 granting or withholding the requested relief and pay "particular
23 regard" to the public's interest.  <u>Winter</u>, 555 U.S. at 24.  The
24 court acknowledges that American Bullion seeks a wide-ranging
25 injunction.  The alternative injunction ordered by the court,
26 however, does not unduly burden Regal.  Regal's primary argument is
27 that its affiliates are independent contractors, not employees.
28 That argument is unpersuasive, for the reasons described above.

10

Regal's contention that its affiliates will abandon Regal in favor of competitors also carries little weight in light of the strict provisions of the Affiliate Agreement, which would prevent affiliates from working against Regal's interests for a period of at least five years.

The deleterious effects of denying American Bullion any relief, in contrast, would be severe, as it has already lost sales and goodwill as a result of the wrongful acts alleged and those acts and effects appear to be continuing. Regal's public interest arguments again focus on the rights of ostensibly independent affiliates who are, in fact, Regal's agents. Though Regal contends for the first time that the statements at issue here have not been proven to be false or deceptive, that argument is at odds with Regal's apparent acknowledgment that, at the very least, American Bullion is not related to American Bullion Exchange and that Reeves Jameson does not exist.[6] The public interest will be well served by an injunction preventing deceptive or confusing advertising. See <u>Homeland Housewares LLC v. Euro-Pro Operating LLC</u>, No. CV 14-3954 DDP, 2014 WL 4187982 at *6 (C.D. Cal. Aug. 22, 2014).

The court further notes that nothing in this order or the accompanying injunction deprives Regal of its ability to make use of affiliates. To be clear, there is nothing inherently wrongful about affiliate marketing arrangements. Nor are affiliates,

---

[6] Regal's argument in this context is particularly puzzling given its failure to make similar contentions with respect to American Bullion's likelihood of success on the merits. As explained above, Regal argues not that the statements are not false or deceptive, but only that independent third parties are responsible for the statements.

11

including online affiliates, necessarily agents of the business with which they contract or otherwise form a relationship. See, e.g., Routt v. Amazon.com, Inc., – Fed. Appx. –, 2014 4252287 (9th Cir. Aug. 29, 2014) (unpublished disposition). Only a fact-specific inquiry can reveal whether an affiliate in name is truly independent or, as is the case here, is so locked-in and subservient to the interests of an associated enterprise as to function as an agent or extension of that business.

**IV. Conclusion**

For the reasons stated above, Plaintiff's Motion for Preliminary Injunction is GRANTED. An injunction shall issue by separate order of this court. In the event Regal modifies its Affiliate Agreement or otherwise establishes a new, non-controlling relationship with its current agents, the court will consider modifying the terms of the accompanying preliminary injunction.

IT IS SO ORDERED.

Dated: November 17, 2014

DEAN D. PREGERSON
United States District Judge